713 So.2d 729 (1998)
STATE of Louisiana, Plaintiff-Appellee,
v.
Norman Francis DOZIER, Jr., Defendant-Appellant.
No. CR97-1564.
Court of Appeal of Louisiana, Third Circuit.
May 20, 1998.
*730 Jerold Edward Knoll, David Edwin Lafargue, Marksville, for State.
George Lewis Higgins, III, New Orleans, for Norman Francis Dozier.
Before THIBODEAUX, SAUNDERS and DECUIR, JJ.
THIBODEAUX, Judge.
The defendant, Norman Francis Dozier, Jr., was indicted for first degree murder. He was found guilty of second degree murder and now appeals his conviction. We affirm.

FACTS
In the late hours of January 9, 1996 and/or early hours of January 10, 1996, the defendant and his three co-defendants, Winfred Davenport, Jr., Vickie Coco, and Clinton Ray Brackens, went to the home of the victim, 82-year-old Clarence Robin. Vickie Coco knew the victim and had visited his home on prior occasions. On these occasions, Coco allegedly would go to the victim's home with another female. While the other woman allowed the victim to fondle her, Ms. Coco would enter the bedroom and steal *731 money. Ms. Coco admitted during her testimony that she had been a crack cocaine addict and had supported her habit through prostitution and theft.
During the early afternoon of January 9, 1996, Ms. Coco went to the victim's home with Betty Desselles. While Ms. Desselles kept the victim occupied, Ms. Coco went to the bedroom and took $900.00 from his shirt pocket. Ms. Coco and Ms. Desselles shared the money. Later that day, Ms. Coco used her portion of the money to purchase crack cocaine from the defendant at the home of Clinton Ray Brackens; Coco purchased cocaine from the defendant several times during the day. When the defendant and Mr. Brackens learned that Ms. Coco had stolen the money she was using from Mr. Robin, they decided to take Ms. Coco back to the victim's home in order for her to steal more money. The defendant and Brackens allegedly plotted to "knock him [the victim] out" during the course of the robbery; however, neither of the men wanted to actually do it. According to Ms. Coco's testimony, the defendant stated he knew a man who would knock the victim out. Thereafter, the three drove to Pineville and picked up Winfred Davenport, Jr., who was advised of the plan and allegedly agreed to "knock out" the victim. The foursome then proceeded to the victim's house in Hessmer, Louisiana.
When they reached the victim's house, Ms. Coco got out of the vehicle. She testified that she saw co-defendant, Davenport, obtain a tire tool from the vehicle. Ms. Coco then walked to the victim's bedroom window and knocked on it. Soon thereafter, Mr. Robin opened the door and allowed Ms. Coco to enter the house. Mr. Robin allegedly told Ms. Coco to go upstairs and that he would join her shortly. Ms. Coco went to the bedroom to look for more money but found none. Thereafter, Ms. Coco heard Mr. Robin shout "oh no, oh no." She ran through the hallway and saw the defendant and Mr. Davenport standing in the bathroom, but she did not see the victim, Mr. Robin. She then ran out of the house. Thereafter, the four co-defendants left Mr. Robin's house and returned to Mr. Brackens' house.
On January 10, 1996, Mr. Robin was found dead in his bathroom. He had been struck over the head with an object and died from the injuries.

ASSIGNMENTS OF ERROR NOS. 1 & 2
By these assignments, the defendant contends the trial court erred first by denying his Motion for a Mistrial based on the state's untimely production of the coroner's report and secondly by ruling that the coroner's report was inadmissible at trial. On May 19, 1997, the eighth day of jury selection, the state provided the defendant with a copy of a one-page coroner's report prepared and signed by Dr. L.J. Mayeaux on January 10, 1996. On the following day, the state presented the defense with the one-page death certificate signed on January 15, 1996 by Dr. Mayeaux. The defendant asserts that these documents constituted exculpatory evidence which should have been provided to him within a reasonable time prior to trial, in accordance with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. He further contends that the untimely disclosure of such documents prejudiced him as he was unable to effectively prepare his defense. The state contends that the documents were turned over to the defense immediately after the state received them and the documents were not intentionally withheld.
Specifically, the defendant argues that the time of death reflected on the coroner's report could have been used to impeach the testimony of the state's star witness, Vickie Coco. Dr. Mayeaux stated in his coroner's report prepared at 11:30 a.m. on January 10, 1996 (the date of death) that:
Victim appears to have been dead in the four to six hour range. The temperature on this date was down to approximately 34 degrees for a low last night. Temperature at the present time is 62 degrees.
The other document produced by the state, the death certificate signed by Dr. Mayeaux, placed the time of injury at 2:30 a.m. on January 10, 1996 and the time of death at 6:00 a.m. on January 10, 1996, and specifically noted that the interval between onset and death was three to four hours.
*732 During her testimony at the present defendant's trial, Vickie Coco admitted that she and Betty Desselles had been to the victim's home on the afternoon of January 9, 1996. She allegedly went back in the late hours of January 9, or early hours of January 10, 1996, with the co-defendants. On both direct and crossexamination, Ms. Coco stated that after she and her three co-defendants went to the victim's home (when the victim was allegedly attacked) the four left the victim's home and returned to the home of Clinton Ray Brackens at approximately 12:30 a.m. on January 10, 1996. On cross-examination, she acknowledged that she and her codefendants were back at the Brackens' house by 1:00 a.m. at the latest. On crossexamination, the following exchange took place between defense counsel and Ms. Coco:
Q.... Isn't true that when ... that you, Norman, and the Brackens boy, that they let you off at around twelve o'clock that night?
A. Where?
Q. In Marksville.
A. No, that's not true.
Q. Vickie, isn't it true that you and friends went to Mr. Robin's house in the wee hours of the morning trying to get money at around two, two-thirty a.m. in the morning?
A. [inaudible]
Q. And that's when the murder took place?
A. No, that's not true.
Q. And that Mr. Dozier had nothing to do with this?
A. Norman Dozier was there. He had a lot to do with it.
As the excerpt indicates, the defendant attempted to impeach Vickie Coco by suggesting that she returned to the victim's home between 2:00 and 2:30 a.m. either alone or with people other than the defendant and during that time the victim was fatally injured. The death certificate clearly indicated that the time of injury was 2:30 a.m. However, the defendant in his brief focuses on the information contained in the coroner's report (as opposed to the death certificate); the coroner's report placed the time of death at four to six hours prior to the report's preparation at 11:30 a.m. (i.e., 5:30 a.m. to 7:30 a.m.). The relevant time with respect to impeachment of Ms. Coco's testimony would have been the time of injury as indicated by the death certificate and not the time of death suggested by the coroner's report.
In State v. Huls, 95-0541 (La.App. 1 Cir. 5/29/96); 676 So.2d 160, writ denied, 96-1734 (La.1/6/97); 685 So.2d 126, reconsideration denied, 96-1734 (La.3/21/97); 691 So.2d 71, the first circuit summarized the applicable law as follows:
The suppression of evidence favorable to an accused by the prosecution violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). See also Kyles v. Whitley, 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Evidence favorable to an accused includes exculpatory evidence as well as evidence which can be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 and 685, 105 S.Ct. at 3383 and 3385. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
In reviewing materiality, this court must provide a cumulative evaluation of the suppressed evidence, keeping in mind the defendant does not have to show that, with the addition of the undisclosed evidence, his trial would have resulted in acquittal, or that there would be an insufficiency of the evidence to support a conviction. The defendant need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." State v. Marshall, 94-0461 and 81-3115 (La.9/5/95), 660 So.2d *733 819, 826 (quoting Kyles v. Whitley, 514 U.S. at 441, 115 S.Ct. at 1569). Once a reviewing court applying Bagley has found constitutional error, the error cannot subsequently be found harmless. Kyles v. Whitley, 514 U.S. at 434-35, 115 S.Ct. at 1566.
In the instant case, the issue is the timeliness of the state's disclosure rather than the failure to disclose. Disclosure of favorable evidence by the state must be made at such a time as to allow the defense to use the material effectively in the presentation of its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). Not all cases involving late disclosure of favorable evidence result in reversible error. We must determine if the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. See State v. Smith, 430 So.2d 31, 42 (La.1983). See also United States v. Stephens, 964 F.2d 424, 435-36 (5th Cir.1992).
Id. at 169-170.
Likewise, this court has stated that "[a] tardy disclosure of evidence during trial is not a true Brady case." State v. Corley, 617 So.2d 1292, 1302 (La.App. 3 Cir.), reversed on other grounds, 93-1934 (La.3/11/94); 633 So.2d 151, rehearing denied, certiorari denied, 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994). In the present case, the issue is the timeliness of the disclosure of the evidence and not the failure of disclosure. The two documents were disclosed to the defense on May 19, and May 20, 1997, during the last days of jury selection. Vickie Coco was called as a witness on May 21, 1997. Therefore, the defense had a two-day period to prepare for crossexamination of Ms. Coco based on the newly discovered evidence.
However, the situation is complicated by the trial court's ruling that the coroner's report was inadmissible after the defendant sought to introduce the report at trial. The trial court refused to admit the report without the testimony of the coroner, Dr. Mayeaux, who was out of state at the time of the defendant's trial. The defendant did not seek to subpoena Dr. Mayeaux. La.Code Crim.P. art. 105 provides that a coroner's report shall be "competent evidence of death and the cause thereof, but not of any other fact." The defendant intended to introduce the coroner's report for the specific reason of discrediting the testimony of Vickie Coco concerning the time of the victim's injury and/or death. Pursuant to Article 105, the report on its own was not admissible for that purpose.
Furthermore, the defendant was not prejudiced by the inadmissibility of the coroner's report. As previously discussed, the death certificate (which indicated the time of injury) could have been used to impeach the testimony of Vickie Coco. The trial court expressly ruled that the death certificate was competent evidence on its own and thus was admissible in absence of Dr. Mayeaux's testimony, as a record of vital statistics in accordance with La.Code Evid. art. 803(9).
Likewise, the defendant was not prejudiced by the late disclosure of the two documents. Although the documents were not produced until after trial had begun, the defendant could have still introduced the death certificate to impeach Vickie Coco, but for whatever reason chose not to do so. It cannot be said that the defendant's rights to a fair trial were prejudiced by the state's late disclosure of either of the two documents. For the foregoing reasons, both Assignments 1 and 2 lack merit.

ASSIGNMENT OF ERROR NO. 3
By this assignment, the defendant contends the trial court erred by denying his motion to view the crime scene. On May 7, 1997 (five days before jury selection began), the defendant filed a written Motion to Allow Defendant to View the Scene of the Crime with his Attorneys. On May 8, 1997, a hearing was held at which time it was established that the crime scene, i.e., the victim's residence, had been leased by the Robin family to a third party. The state offered the testimony and evidence which had been presented at an earlier hearing on a similar motion filed on behalf of co-defendant, Winfred Davenport. Citing the evidence from and ruling on Davenport's motion, the trial court denied the defendant's motion and gave its reasons, as follows:

*734 The problem with that, quite frankly, from the evidence presented at the Davenport hearing, is that the State, certainly, is not in the care, custody and control of the house and neither are the Robin children, any longer. So, I don'tthis courtunder the case law that I studied, at that time, I wouldn't have the authority to order the present occupants of that home to allow anybody in that home, for any reason involving this case, that I'm aware of.
* * * * * *
... for that reason the court is going to deny, for those reasons that's cited, DENY the Motion to Allow the Defendant to View the Crime Scene, mainly, because the crime scene is not in the care, custody and control of the State of Louisiana, or the family of the victim of the crime; and THEREFORE, is unavailable, under the court's authority, to so order.
In his brief, the defendant claims the trial court's denial of the motion to view the crime scene violated several of his constitutional rights including his rights to due process, to confront and cross-examine witnesses, present a defense, to effective assistance of counsel, to a fair trial, and his right against cruel and unusual punishment. Two Louisiana cases have dealt with the issue of the defendant's right to view the crime scene; however, in both cases, the crime scenes were open to the public.
In State v. Nicholson, 437 So.2d 849 (La. 1983), the defendant was charged with murder of a convenience store clerk, and his attorney filed a motion to seal the crime scene for defense inspection hours after the crime was committed. The trial court concluded that there was no authority for such an order and denied the motion. The Louisiana Supreme Court affirmed the trial court's ruling reasoning that "[o]rdering the Quik Stop sealed for defense inspection that evening would have been pointless." Id. at 853. The crime scene was a convenience store open for business and available for examination on the morning of the murder. Although the premises had been cleaned, they were open to the public and a court order was unnecessary for examination by the defense.
Later, in State v. Williams, 615 So.2d 1009 (La.App. 1 Cir.), writ denied, 619 So.2d 543 (La.1993), a defendant charged with murdering a man in a public parking lot filed a motion to inspect the crime scene with his attorney. The motion recited it was necessary for the defendant to view the scene in order for his counsel to take pictures and measurements and otherwise properly investigate the scene with defendant's assistance. The trial court's denial of the motion was upheld on appeal. The first circuit reasoned as follows:
... The crime scene (the K-mart parking lot) was part of a business establishment open for business to the general public and not a place within the possession, custody, or control of the State. Accordingly, these premises were accessible to defense counsel for the purposes stated in the motion, i.e., to take pictures and measurements and otherwise properly investigate the scene.
The essence of defendant's contentions is that a court order should have been issued compelling his presence at the crime scene with his counsel for the purposes stated in the motion. However, defendant does not claim, nor does the record show, that he was prejudiced by the trial court's denial of the motion to compel his presence at the crime scene.
Under the circumstances present in this case, we do not find any abuse of discretion by the district court in denying the motion.
Id. at 1014.
Thus, in both Nicholson and Williams, the courts ruled that there was no need to issue an order permitting inspection by defense counsel since the crime scenes were publicly accessible areas. The issue presented by the present facts involves a trial court's authority to order inspection of a crime scene which is a private residence.
The trial judge in the present case believed he did not have the power to order the inspection of the private residence which was at the time leased by a third party. As discussed at the defendant's hearing, co-defendant, *735 Winfred Davenport, filed a similar motion requesting that he and his attorneys be allowed to view the crime scene. The trial court denied Davenport's motion apparently on the same basis as the denial of the present defendant's motion; that is, the court did not believe it had the authority to order an inspection of a private residence. Davenport filed a pre-trial writ application with this court challenging the trial court's ruling. This court denied the writ application finding no error in the trial court's ruling. State v. Davenport, unpublished writ bearing docket number 97-535 (La.App. 3 Cir. 5/23/97). However, the Louisiana Supreme Court vacated the trial court's ruling and remanded the case to the trial court with instructions "to issue an appropriate order permitting access to the crime scene by defendant and his counsel." State v. Davenport, 97-1688 (La.6/30/97); 696 So.2d 999. The supreme court's decision in Davenport was rendered after the present defendant's trial had concluded. Nonetheless, by implication, the supreme court in Davenport held that not only did the trial court have the authority to order the defense's inspection of the Robin residence, but also that the trial court should have ordered such an inspection. Accordingly, the trial court erred in the present case by denying the defendant's motion to view the crime scene.
Nevertheless, the error was harmless. In brief, defense counsel argues that due to the denial of the right to inspect the crime scene he was unable to effectively cross-examine witnesses concerning the layout and lighting of the house. Principally, he claims that he could not effectively cross-examine Vickie Coco on her ability to see certain events. During her testimony, Ms. Coco stated that after she heard Mr. Robin's shouts which came from the bathroom she made her way past the bathroom door and saw "Norman Dozier ... and ... Davenport standing in the bathroom" but she could not see Mr. Robin. On cross-examination, Ms. Coco admitted that in one of her statements to the police she stated that she ran through the house and did not look in the direction of the bathroom as she made her way outside. Thus, counsel was able through other means to discredit Coco's testimony concerning what she observed in the house. Although counsel should have been allowed to personally view the scene, the defendant did have access to photographs and a diagram of the scene prepared by the state.
The defendant cites United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), for the proposition that he does not have to show prejudice with respect to his claim of ineffective assistance of counsel. In the context of an accused's Sixth Amendment right to counsel, the Supreme Court in Cronic acknowledged that in certain cases there could be "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Id., 466 U.S. at 659, 104 S.Ct. at 2047, citing Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347. The Court in Cronic further stated that "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Id., fn. 26, 466 U.S. at 660, 104 S.Ct. at 2047. The present situation is not a case of such constitutional magnitude as to absolve the defendant of the requirement of showing prejudice.
The defendant has failed to demonstrate that he was prejudiced by the trial court's ruling. Thus, this assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 4 & 5
By his fourth and fifth assignments, the defendant contends the trial court erred by denying his Motion to Quash the Indictment and also his Motion to Recuse the District Attorney from the hearing on the Motion to Quash.
These assignments revolve around the actions of Arthur Drummer, a deputy sheriff in Avoyelles Parish and also a minister. During the months of September and October 1996, Mr. Drummer allegedly approached the parents of the defendant, Norman Dozier, Sr. and Brenda Dozier, and offered to use his influence to negotiate a deal with District Attorney Eddie Knoll and District Court Judge Johnson (who at the time was the *736 presiding judge prior to Judge William J. Bennett taking office) by which the defendant would be released on bail. The Doziers videotaped two of their conversations with Mr. Drummer which occurred at the Dozier home; the transcript of the videotape was admitted as evidence on the Motion to Recuse. Although the primary goal of the negotiations seemed to be the defendant's release on bail, the parties also discussed the possibility of having the charges against the defendant reduced in exchange for information related to the murder of Mr. Robin.[1] Mr. Drummer stated during one of the meetings that he had met with District Attorney Knoll and Judge Johnson and that both Knoll and Johnson wished the defendant to cooperate with the D.A.'s office. According to Drummer, District Attorney Knoll knew that the defendant did not murder Mr. Robin and wanted the defendant to divulge who actually did. Mr. Drummer also allegedly visited the Defendant in jail on more than one occasion. Drummer asked the Doziers for a $4,000.00 fee for his services. All of these events occurred without the knowledge of defense counsel.
Based on the actions of Mr. Drummer, the defendant filed a Motion to Quash the Indictment, a Motion to Recuse the District Attorney from the hearing on the Motion to Quash, and a Motion to Suppress all statements made by the defendant to Arthur Drummer and also all evidence derived from such statements. At the hearing on these motions, District Attorney Knoll testified and denied any involvement in Mr. Drummer's scheme. Although he admitted that Drummer had approached him twice concerning bail for the defendant, District Attorney Knoll allegedly informed Drummer on both occasions that first-degree murder was a non-bailable offense and that the defendant would not be considered for bail. Knoll further stated:
Number one, on my oath, at no time did I ever send this man to talk to him; as a matter of fact, I did not even know that he was talking to Norm Dozier. He came to me and told me that he was talking to his mama and daddy who were nice people, okay? That's the first thing. So, I want to tell you that under no circumstances was he ever on any kind of a mission for me. I had nothing to do with him talking to him. The second thing is that I want to tell you, and I don't think I really need to say that because again I think Mr. Higgins, you know Eddie Knoll sufficiently well. I want to tell you that never ever did Eddie Knoll ever take one cent of that four thousand dollars and in twenty-five years I have never ever done that. I would never ever do that in any kind of a method, shape fashion or form.
* * * * * *
BY MR. LAFARGUE [Assistant District Attorney]:
Just ... there were no deals whatsoever with Reverend Drummer at all either with regard to this particular charge?
A. No deals whatsoever.
Q. No obligations that you know of?
A. No obligations from this district attorney to Reverend Drummer.
Q. Any instructions that he'd do anything with respect to this case?
A. Absolutely not. None.
BY MR. LAFARGUE:
No further questions.
BY MR. HIGGINS [Defense Counsel]:
Judge, let me ask a couple of more.
RE-CROSS EXAMINATION
BY MR. HIGGINS:
If Reverend Drummer testifies at the Motion to Quash hearing that he had contacts with you, contacts with Judge Johnson, that you told him what Norman needed to do to get out of jail, that he needed to cooperate, give some information, so he went back to Norman Jr. and tried to talk him into that, you would testify at that Motion to Quash, correct?

*737 A. And I would testify that that is absolutely untrue. During the hearing, the defendant requested that Arthur Drummer and the defendant's parents, Norman Dozier, Sr. and Brenda Dozier, be granted immunity from prosecution for public bribery in exchange for their testimony at the defendant's hearing. District Attorney Knoll unequivocally refused to grant such immunity. The defendant sought to have District Attorney Knoll recused from the hearing based primarily on the conflict arising from the potential testimony of Arthur Drummer and the Doziers depicting District Attorney Knoll's involvement in their negotiations and Knoll's ability to grant the witnesses immunity from prosecution. The defendant argued that Knoll and his office should be recused from the decision of whether the witnesses should receive immunity due to Knoll's alleged involvement in Drummer's scheme and that the Attorney General's office should be called upon to decide the immunity issue. The trial court denied the defendant's Motion to Recuse.
La.Code Crim.P. art. 680 provides:
A district attorney shall be recused when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
(2) Is related to the party accused or to the party injured, or to the spouse of the accused or party injured, or to a party who is a focus of a grand jury investigation, to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
We acknowledge the defendant's dilemma caused by the district attorney's refusal to grant immunity. When the defendant called Arthur Drummer, Norman Dozier, Sr., and Brenda Dozier as witnesses on the Motion to Quash and the Motion to Suppress, each invoked their Fifth Amendment Privilege against Self-Incrimination. However, on cross-examination by the state, Drummer admitted that District Attorney Knoll had told him that the defendant's charge, first-degree murder, was a non-bailable offense. Subsequently, the trial court denied both motions because the defense had failed to present sufficient evidence in support of the motions.
Nevertheless, even if Drummer and the defendant's parents had been granted immunity and testified at the hearing in the same manner as the defendant alleges that they would have testified, the allegations of these witnesses would not have been proper grounds for quashing the indictment. In his brief, the defendant correctly states that Louisiana courts have recognized that an indictment may be dismissed for due process violations. However, the cases cited by the defendant have involved preindictment prosecutorial misconduct which could have effected the grand jury. In State v. Walker, 567 So.2d 581 (La.1990), a case involving pre-indictment prosecutorial misconduct, the Louisiana Supreme Court stated:
To warrant dismissal of an indictment the prosecutorial misconduct must be of such a nature as to mislead or unfairly affect the integrity of the grand jury as an independent and unbiased body.
* * * * * *
The ultimate issue in a motion to dismiss an indictment on the basis of prosecutorial misconduct is whether the proved misconduct warrants such a drastic remedy. The remedy for prosecutorial misconduct should generally be tailored to the injury suffered from the misconduct. See United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (a government agent's unsuccessful attempt to obtain incriminating information from the accused, without the presence or knowledge of his counsel, does not warrant dismissing the indictment with prejudice because the alleged misconduct had no adverse impact on the accused).(FN8) Absent demonstrable prejudice, dismissal of the indictment is plainly an inappropriate remedy for misconduct by the prosecutor's attempting to obtain evidence illegally. Id. at 366, 101 S.Ct. at 669. The remedy under such circumstances is limited to denying the prosecution *738 the fruits of its transgression. Id. at 367, 101 S.Ct. at 669.
FN8. The Morrison decision further indicated that the appropriate remedy for a prosecutor's obtaining incriminating evidence improperly is generally to suppress the evidence, rather than to dismiss the indictment, or to reverse the conviction based on the improper evidence, in which case the government could proceed with a new trial.
Id. at 586-588. See also State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993); State v. Caldwell, 616 So.2d 713 (La.App. 3 Cir.), writ granted and case remanded on other grounds, 620 So.2d 859 (La.1993), on remand, 95-1440 (La. App. 3 Cir. 4/17/96); 673 So.2d 1156.
With his Motion to Quash, the defendant also filed a Motion to Suppress all statements made by the defendant to Arthur Drummer and all evidence derived from such statements. The motion was denied by the trial court. However, the record does not indicate nor does the defendant claim that the state presented any evidence at trial derived from the improper communications between Drummer and the defendant. Although the actions of Arthur Drummer were deplorable, the defendant has not Inshown that he was prejudiced by the misconduct. Accordingly, these assignments lack merit.

ASSIGNMENT OF ERROR NO. 6
By this assignment, the defendant contends the trial court erred by denying his Motion for a Mistrial which was made during the state's closing argument. The defendant's motion was based on the state's improper references to out-of-court statements made by co-defendant, Clinton Ray Brackens. Although the defendant does not cite the record references for such a ruling, apparently the trial court had previously ruled that such statements by Brackens were inadmissible.
During the rebuttal portion of the state's closing argument, the following comments were made by District Attorney Eddie Knoll:
... You want to talk about the credibility of thisof Vickie Coco? You want to know, ladies and gentlemen, when she came forth and ultimately told the truth about this murder? Take a look at the scenario. She had given three statements, three statements saying "I don't know anything about this murder." Low and behold, when she goes into that sheriff's office and she sees none other than Clinton Ray Brackens, a co-heart in the murder of Mr. Robin, what does she do? The very first thing she does, she become physically ill. She is throwing up. You want to know what? What words did Mr. Lafargue [Assistant District Attorney] use, the jig was up. That's correct, because then she knew that she was gone. She knew that we were going to be able to prove that murder. And it was not until we haduntil she knew that we had some evidence that was going to convict her of this crime did she come forth and give that information.
BY MR. HIGGINS:
Judge?
BY THE COURT:
Hold on, Mr. Knoll. One second. Side bar, please.
Although the side bar was not transcribed, defense counsel presumably made a Motion for a Mistrial during the side bar. Later, after the jury had retired for deliberations, defense counsel reurged the Motion for a Mistrial, as follows:
BY MR. HIGGINS [Defense counsel]:
Your Honor, I guess I could reurge what we (UNINTELLIGIBLE) about a motion for mistrial.
BY THE COURT:
Yes, sir.
BY MR. HIGGINS:
On Mr. Knoll's comments concerning what I perceive to be inadmissible statements about Clinton Ray Brackens. We addressed that in the hall, sir. I just submit with you that ...
BY THE COURT:
Yes, sir, the court, for purposes of clarity of the record during rebuttal argument by Mr. Knoll, reference was made to several statements being obtained by Detective Smith. In this court's opinion, Mr. Knoll had not yet reached the point of referring specifically to Clinton Ray Brackens and upon admonition, did not do *739 so. The motion for mistrial, however, at that point was made by the defense, is noted and preserved for the record, but the motion was denied.
BY MR. HIGGINS:
Thank you, your Honor.
With respect to the scope of closing argument, La.Code Crim.P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
In State v. Livings, 95-251 (La.App. 3 Cir. 11/15/95); 664 So.2d 729, writ denied, 95-2906 (La.2/28/96); 668 So.2d 367, this court stated:
The trial court has wide discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564 (La. 1981). Generally, a wide latitude is allowed counsel in closing argument, and only if there is undue restriction of argument resulting in substantial prejudice is reversal required. State v. Joseph, 341 So.2d 861 (La.1977); State v. Taylor, 430 So.2d 686 (La.App. 2 Cir.), writ denied, 438 So.2d 575 (La.1983). Thus, even if the reference were improper, for the district attorney's action to be grounds for mistrial, or for reversal on appeal, there must be a showing that the impropriety influenced the jury and contributed to the verdict. State v. Jarman, 445 So.2d 1184 (La.1984); La.Code Crim.P. art. 921.
Id. at 737.
As the trial court noted, District Attorney Knoll did not specifically refer to the inadmissible statements during closing argument, and after the trial court admonished him not to make such references, he abstained from doing so. Even if the district attorney intended to refer to the inadmissible statements, he was halted before he could do so. There is no indication that this slight impropriety influenced the jury or its verdict. The trial court did not err in its denial of the Motion for a Mistrial.

ASSIGNMENT OF ERROR NO. 7
By this assignment, the defendant contends the trial court erred in denying his Motion for a Mistrial based on his objections to references to other crimes evidence by state witness, Vickie Coco. During cross-examination of Vickie Coco by defense counsel, the following exchange took place:
Q .... well, why did you lie to the police?
A. I was scared of what Norman Dozier would do to my kids.
Q. You were scared of what ...
A. Yes, sir.
Q.... Norman Dozier would do to your kids, huh? Because he knew right where your kids were.
A. Yes, sir, he did.
Q. And you were scared that Norman Dozierbig bad Norman Dozier would put out a hit ...
A. On my children.
Q.... on your children, and that he with this organized-crime family would in some way abduct your children and kill them. I mean, that's what you were scared of, huh?
A. I wouldn't know how it would happen but I figured, yes, that he would kill my children.
Q. Oh, okay. And that greatly concerned you?
A. Yes, it did.
* * * * * *
Q. Okay. So, y'all had such a long and lengthy relationship that you knew Mr. Dozier, you knew what kind of person he was, and you knew that he knew everything about you ...
A. I knew that ...
Q.... yet you had met him that day.
A. I had met him that day and, after that conversation, and then after the police had informed me when I got to the ...
BY MR. HIGGINS:
Judge ...
BY MR. LAFARGUE:
Let her finish the question.
BY THE COURT:

*740 Hold on. You asked that question, she can answer the question.
BY MR. HIGGINS:
About what the police say, Judge?
A. No, after the police had informed me...
BY THE COURT:
Wait, hold on ...
A .... of Dick's real name.
BY THE COURT:
Okay. About his real name?
A. Yeah.
BY THE COURT:
You just knew him as Dick Dozier?
A. I knew him as Dick.
BY THE COURT:
Okay.
A. When the police informed me about his real name, I remember about ... I remember of what he said that he had stayed with Christine and I remembered that Christine telling me of the death threat that he had put on her little boy...
BY MR. HIGGINS:
Judge ...
A .... and I was very ...
BY THE COURT:
Wait, hold on, hold on.
BY MR. HIGGINS:
Judge. Side bar please?
The side bar was not transcribed. However, in his brief, defense counsel asserts that he made a Motion for a Mistrial during the side bar based on the state's failure to give proper notice of other crimes evidence, in accordance with State v. Prieur, 277 So.2d 126 (La.1973). In his brief, the defendant specifically argues that despite his numerous pre-trial motions in which he sought notice of the state's intent to introduce other crimes evidence, the state failed to notify him of the allegations concerning a death threat made against Christine Hill's child.
In its brief, the state first contends Ms. Coco's remarks were responsive to the questions asked by defense counsel. Secondly, the state asserts it did give notice of such allegations in its written response entitled Supplemental Response to Defendant's Motion for Discovery and Special Motion for Bill of Particulars Regarding Other Crimes Evidence, which included a transcript of the trial of codefendant, Clinton Ray Brackens. Vickie Coco testified at the Brackens' trial and mentioned in her testimony that the defendant, Norman Dozier, had threatened Christine Hill. However, in the supplemental response as well as at the hearing, the state expressly limited use of other crimes evidence referred to in testimony at the Brackens' trial to crimes which occurred on January 9, or January 10, 1996, the time frame during which the present crime was committed.
La.Code Crim.P. art. 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
However, Article 770 does not apply to the present situation as the disputed remarks were made by a witness, and not the judge, district attorney, or a court official. State v. Wingo, 457 So.2d 1159 (La.1984); State v. Edouard, 512 So.2d 23579 (La.App. 3 Cir.1987). Thus, the decision to grant or deny the mistrial in the present case was governed by La.Code Crim.P. art. 771, which provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the *741 jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
In State v. Tribbet, 415 So.2d 182 (La.1982), a police officer, while testifying on cross-examination by defense counsel, alluded to other crimes or arrests of the defendant. The Louisiana Supreme Court reiterated its position that the state cannot be charged with testimony elicited by defense counsel implying that defendant had previously committed other crimes, and the defendant cannot claim reversible error on the basis of that which he elicited. See also State v. Maze, 596 So.2d 218 (La.App. 3 Cir.), writ denied, 604 So.2d 963 (La.1992). Furthermore, the requirement that the state give notice of its intent to introduce other crimes evidence is not applicable when defense counsel elicits testimony on cross-examination concerning other crimes. See State v. Pooler, 96-1794 (La.App. 1 Cir. 5/9/97); 696 So.2d 22.
Arguably, in the present case, Ms. Coco's testimony was not elicited entirely by defense counsel, as the trial judge was questioning Ms. Coco just prior to her remarks concerning an alleged death threat made by the defendant. However, the testimony was not elicited by the state. Therefore, the state was not required to give notice of such evidence.
Furthermore, the trial court did not err in denying the defendant's Motion for a Mistrial. Ms. Coco's comment was brief and made without elaboration. "[M]istrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the accused." State v. Smith, 418 So.2d 515, 522 (La.1982); Maze, 596 So.2d 218. It cannot be said that the brief remark caused substantial prejudice to the defendant.
Lastly, the trial court did not admonish the jury to disregard Ms. Coco's comment. La. Code Crim.P. art. 771 mandates a request for an admonishment. Tribbet, 415 So.2d 182; State v. Fuselier, 474 So.2d 556 (La.App. 3 Cir.1985). Because the side bar was not transcribed, the record does not indicate whether the defendant requested such an admonition. Furthermore, in his brief, the defendant does not complain of lack of an admonition.
In sum, this assignment lacks merit.

ERROR PATENT
The trial court improperly informed the defendant that he had three years from the date of sentencing to file an application for post-conviction relief. Under La.Code Crim.P. art. 930.8, the defendant has three years after the judgment of conviction and sentence have become final to apply for post-conviction relief. Thus, the trial court is directed to inform the defendant of the correct provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Eason, 624 So.2d 934 (La.App. 2 Cir.1993).

CONCLUSION
For the foregoing reasons, the defendant's conviction is affirmed. The district court is directed to inform the defendant of the correct provision of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record of the proceedings that the defendant received the notice.
CONVICTION AFFIRMED.
NOTES
[1] Bail is prohibited in capital cases if "the proof is evident and the presumption great" that the defendant is guilty. La.Code Crim.P. art. 331. Thus, the first-degree or capital murder charge against the defendant in this case would presumably have to have been reduced in order for him to receive bail.